## BERTHA GILLER v. FIRST NATIONAL BANK OF THIEF RIVER FALLS AND ANOTHER.[1]

February 17, 1922.

No. 22,599.

**Fraud in obtaining plaintiff's signature—evidence insufficient.**

Plaintiff executed a contract with the defendant bank, whereby she agreed to assign certain notes and mortgages to the bank to secure the payment of her son's indebtedness and to indemnify the other defendant against loss as surety on her son's bail bond. In consideration thereof the bank agreed to surrender certain insurance policies it held as security for her son's debt and to have its codefendant execute the bond. The contract was prepared by plaintiff's attorney and after its execution its several conditions were performed. In an action for the conversinon of the notes and mortgages assigned, the contract was pleaded as a bar. Plaintiff sought to avoid it on the ground that her signature was procured by fraud. *Held* that the evidence was not so clear, strong or persuasive as to justify a jury in finding that plaintiff had been induced to execute the contract by fraud.

Action in the district court for Pennington county to recover $12,005 for conversion of certain securities. The case was tried before Grindeland, J., who at the close of the testimony denied defendants' motion for a directed verdict, and a jury which returned a verdict for $11,801.92. From an order granting defendants' motion for judgment in their favor notwithstanding the verdict, plaintiff appealed. Affirmed.

*E. M. Stanton* and *H. O. Crommie*, for appellant.

*William J. Brown* and *Julius J. Olson*, for respondents.

[1]Reported in 186 N. W. 816.

LEES, C.

Plaintiff is the mother of Maurice Giller, who, in January, 1919, was a merchant at Thief River Falls. The First National Bank of that place held his unsecured note for $6,620. His store and stock of goods were insured. On January 7 a fire destroyed the greater portion of his stock and damaged the building. On the following day he assigned his insurance policies to the bank at its request as security for his note. On February 24 he was arrested at St. Paul, charged with the crime of arson, and taken to Thief River Falls. His mother, who lived in St. Paul, accompanied him. They arrived on the morning of February 25. She was anxious to keep him out of jail and was informed that, in order to do so, it would be necessary to obtain bail for him. She immediately sent for the defendant C. L. Hansen, who was president of the bank. She and her family had long been patrons of the bank and she was well acquainted with Hansen. She asked him to execute her son's bail bond. He advised her to consult an attorney, and, with his approval, G. Howard Smith was retained. He appeared for Maurice and waived a preliminary examination. Bail was fixed at $5,000. Hansen declined to go on a bond of that amount. Smith exerted himself during the day to have the amount reduced, but without success. Hansen asserts that he informed plaintiff that, if the bond was reduced and he signed it, he would have to be indemnified against loss, and payment of Maurice's note to the bank would also have to be secured. Plaintiff admits the former, but denies the latter portion of the assertion. On the following day bail was reduced to $3,000. Plaintiff, Hansen and Smith met in the afternoon and signed a number of documents prepared by Smith. Among them was a contract between plaintiff and the bank, whereby she agreed to assign notes and mortgages, amounting to $11,300, as collateral security for the payment of her son's note and to secure Hansen against loss as one of the sureties on the bail bond. In consideration thereof the bank agreed to surrender the insurance policies it held and to have Hansen execute the bond. All these conditions were severally performed. Thereafter Maurice was tried and convicted and involuntary bankruptcy

proceedings instituted against him resulted in his being adjudged a bankrupt. A little later plaintiff demanded the return of her securities. Being refused, she brought this action, charging the defendants with their conversion. She recovered a verdict for their face value, and, upon defendants' alternative motion, judgment in their favor notwithstanding the verdict was ordered, and plaintiff appealed.

The vital issue was whether the contract of February 26 was procured by fraud. The question presented on this appeal is whether the evidence will support a verdict that it was. To relate the evidence at length would unduly extend this opinion. We merely outline its principal features.

Hansen went to St. Paul after the fire to get plaintiff to secure the payment of her son's note, but she refused. Maurice had bought the salvage. To enable him to get money to make the purchase, plaintiff assigned one of the mortgages in question to the bank. It held this assignment when Maurice was arrested, but the loan had not yet been made and consequently the assignment was of no effect. The insurance policies were of doubtful value as security. If Maurice was guilty of arson, they could not be collected. If he was adjudged a bankrupt, the bank's right to retain them would be dubious. The arrest of her son greatly disturbed plaintiff. Until she secured bail for him, she was under a nervous and mental strain. She asserts that by reason thereof she was in no condition to transact business on February 25 and 26.

Plaintiff is a Russian by birth, came to this country when she was 18 years old and never attended our schools. She professes not to understand the English language very well, but a reading of her testimony hardly bears her out in this. Her husband had been in the mercantile business at Thief River Falls for several years. After his death she continued the business in partnership with Maurice. She had more business experience than most women have. The partnership was dissolved in February, 1918, owing the bank several thousand dollars. Maurice's note of $6,640 represented $4,000 subsequently advanced to him by the bank and a balance of $2,640 upon the original partnership indebtedness.

Maurice's wife was present when the contract was executed and signed as a witness. After her husband's conviction she divorced him and went to Boston, where she resided at the time of the trial. Her testimony was not taken. After the trial, in connection with defendants' motion, her affidavit was obtained. In it she avers that plaintiff fully understood the terms of the contract and told her before it was drawn that she was going to give the bank security for Maurice's note. Smith testified that he dictated the contract to the bank's stenographer in the presence and hearing of plaintiff and Hansen. Maurice had given his wife an automobile. Plaintiff wanted her to assume part of the obligation to the bank. In dictating the contract Smith named her as a party, it having been agreed that she was to give the bank her note for $1,000 secured by a chattel mortgage on the automobile. Plaintiff objected and insisted that her contract should be separate, and separate contracts were accordingly prepared and signed by the two women. The one with plaintiff was prepared in triplicate. Smith and Hansen both testified that the former read the contract to plaintiff, explaining each paragraph to her as it was read and asking her if she understood it; that she said she did, signed it, and received a copy signed by Hansen. Smith testified that the day before, when he and plaintiff were soliciting Hansen to go on Maurice's bond, he refused unless the amount was reduced and Maurice's note was secured; that plaintiff wanted then to comply with Hansen's demand, but was advised by Smith not to put up collateral for her son's debt, and at his suggestion finally waited until the following day before deciding to enter into the arrangement insisted upon by Hansen. Before deciding she went with Smith to see and confer with Maurice about the matter.

In July, 1919, the first meeting of Maurice's creditors was held before the referee in bankruptcy at Crookston. Hansen and the plaintiff attended. She went at his request. At the hearing a question arose as to the ownership of the automobile mortgaged to the bank. Plaintiff's testimony was taken. She stated that her daughter-in-law had mortgaged the automobile to secure Maurice's note and to protect Hansen against liability on the bail bond, and that

she, too, had wished to do all she could to help her son and thought "it" secured the bond and was for collateral also. What the witness meant by the expression "it" is obscure. Plaintiff's counsel assert that she was referring to the $1,000 note and chattel mortgage; defendants' that she was referring to the mortgages she had assigned. She further testified that she had executed the contract without reading it, but that it was read to her by her attorney. Mr. Sterling, an attorney representing the wholesale houses having claims against Maurice, testified that, at the time of the hearing, plaintiff informed him she had turned her mortgages over to the bank as security for her son's note and to protect Hansen against loss on the bail bond.

The sum and substance of all the evidence is this: On the one hand, there is the uncorroborated statement of the plaintiff that at no time did she agree to give the bank security for the payment of her son's note; that no reference to such security was made when she signed the contract and that she did not know of its provisions for security until after the bank refused to surrender the mortgages to her. On the other hand is the testimony of Hansen, who, like plaintiff, is an interested witness; the explicit testimony of Smith, who, for no apparent reason, has been guilty of a most flagrant breach of trust as an attorney, if plaintiff's testimony is believable; the testimony of Sterling, a wholly disinterested witness; plaintiff's own vague and indefinite statements when a witness in the bankruptcy proceedings, and, most important of all, the plain and simple provisions of the contract itself, bearing her signature, and constituting in itself a strong wall of evidence not to be lightly overcome by unsatisfactory oral testimony, or set aside on the ground of fraud unless the proof be clear, strong and persuasive. Cummings v. Baars, 36 Minn. 350, 31 N. W. 449; McCall v. Bushnell, 41 Minn. 37, 42 N. W. 545; Oxford v. Nichols & Shepherd Co. 57 Minn. 206, 58 N. W. 865; Jumiska v. Andrews, 87 Minn. 515, 92 N. W. 470; Cox v. Edwards, 120 Minn. 512, 139 N. W. 1070; Summit Mercantile Co. v. Daigle, 146 Minn. 218, 178 N. W. 588. The rule is specially applicable where, as here, a party has had the aid of a capable law-

yer to advise her and draw the contract sought to be repudiated. Rosenberg v. Nelson, 145 Minn. 455-464, 177 N. W. 659.

Great stress is laid on the improbability that plaintiff would pledge her mortgages for the payment of a note to which she was not a party. It is said that at a trifling cost a surety company would have furnished a bond for her son, and that the collaterals turned over to the bank would have been readily accepted by such a company. Smith testified that this step was considered, but plaintiff did not want to wait for her son's release, and the latter wanted to get back the insurance policies, which amounted to $17,000. None of the arguments pro and con have been overlooked. We cannot give space to a discussion of all of them.

Viewing the evidence from any angle, it falls far short of clearly showing that the contract does not express plaintiff's agreement with the bank or that her signature was obtained by fraud. The degree of proof required to overthrow a written contract is wholly lacking. The case is not one where there is a defect in the evidence which may be supplied on another trial. There is an entire absence of strong or persuasive proof of fraud.

The order for judgment in defendants' favor is therefore affirmed.